**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| SHANNON SPRECKELMEYER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:15-cv-00912-TWP-DML |
| ) | |
| INDIANA STATE POLICE DEPARTMENT, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the Defendant, Indiana State Police Department's ("ISP") Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56. (Filing No. 37.) Plaintiff Shannon Spreckelmeyer ("Spreckelmeyer") filed this action against her former employer, ISP, asserting claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e ("Title VII"). ISP asks for summary judgment in its favor on the Title VII claims, arguing that Spreckelmeyer cannot support her claims in that ISP had legitimate, nondiscriminatory reasons for not transitioning Spreckelmeyer to a civilian position after her retirement as a merit trooper. For the following reasons, the Court **GRANTS in part and DENIES in part** ISP's Motion for Summary Judgment.

### I.    BACKGROUND

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Spreckelmeyer as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Spreckelmeyer began her employment with ISP in August 1978. She worked as a merit trooper, having police powers. At the time her employment ended with ISP in July 2014, she held the position of an analytical/unit supervisor in the forensic latent prints unit within the Laboratory Division. (Filing No. 15 at 3.)

Spreckelmeyer became eligible for retirement after twenty-five years of service with ISP. ISP offers a voluntary Deferred Retirement Option Plan ("DROP"), which provides certain pension and retirement benefits, and ISP employees are eligible to sign up for the program after reaching twenty-five years of service. The DROP program requires individuals to retire within three years of entering plan. In July 2011, Spreckelmeyer became eligible and chose to enter the DROP program. Therefore, she was required to retire no later than July 2014. (Filing No. 40-3 at 4–5.)

Throughout her employment with ISP, Spreckelmeyer continuously met the legitimate and reasonable expectations associated with her positions. ISP consistently provided her with positive performance evaluations and she was never formally disciplined. (Filing No. 15 at 3.)

In the spring of 2013, Spreckelmeyer was one of two remaining non-civilian analytical supervisors in the Laboratory Division. The other non-civilian analytical supervisor was a man named Mark Keisler ("Keisler"). Spreckelmeyer and Keisler were supervisors in different units within the Laboratory Division—Spreckelmeyer in the forensic latent prints unit and Keisler in the firearms unit. As unit supervisors, they had similar job duties. Spreckelmeyer and Keisler were subject to the same rules, policies, and procedures in April 2013. They were subject to the same chain of command and shared the same supervisor. They were both First Sergeants in April 2013. (Filing No. 15 at 3–4; Filing No. 40-3 at 5.) Spreckelmeyer never worked in the firearms unit where Keisler was employed. She recognized that Keisler was considered a nationally

2

recognized expert in the field of firearms, and acknowledges that while it is a matter of opinion, she did not consider herself a nationally recognized expert in her field of latent prints. (Filing No. 40-3 at 5–6.)

Keisler sought a civilian position with ISP after his retirement as a merit trooper. Unlike Spreckelmeyer, Keisler was not in the DROP program. When Keisler retired as a merit trooper in May 2013, he was a First Sergeant. Before his retirement, a forensic scientist position became available at ISP, so when Keisler retired as a police employee in May 2013, he transitioned into the position as a civilian employee in the Laboratory Division as a supervisor of the firearms unit. Before and after the transition to civilian status, Keisler performed the same job duties and had the same chain of command. ISP did not open Keisler's civilian position for bidding, and it did not take applications or conduct interviews for Keisler's civilian position. (Filing No. 15 at 4–5; Filing No. 40-3 at 5; Filing No. 40-4 at 3.) Before Keisler's retirement and transition into the civilian position, he had never complained of discrimination or threatened a lawsuit against ISP. (Filing No. 40-4 at 7.)

With respect to Keisler's civilian position, ISP submitted its conversion request to the strategic hiring committee on April 5, 2013, while Keisler was still employed, and it was approved shortly thereafter by Superintendent Carter. (Filing No. 40-9.) In order to fund Keisler's civilian position, ISP moved a vacant supervisory position from the latent print unit, Spreckelmeyer's unit, into the firearms unit. (Filing No. 40-4 at 6–8.)

Like Keisler, Spreckelmeyer desired a civilian position with ISP after her retirement as a merit trooper. On September 16, 2013, Spreckelmeyer emailed Superintendent Carter to explain,

> My drop date is July 5, 2014, and it is my desire to finish my drop time as a State Trooper. . . . My current position in the laboratory is Unit Supervisor for the Latent Print and Photography Units. . . . I have been told there will no longer be two Latent Print Unit Supervisors as that position was moved to keep Mark Keisler as the

3

> civilian Firearms Supervisor, a very good move for the department. My situation and Mark's mirror each other except for the fact I am in the drop program and have a concrete end date of 7-5-14. I very much wish to return to my position in a civilian capacity. . . . I know you cannot guarantee I will be able to return as a civilian even though a latent print supervisor's position will be needed upon my retirement. If this seems premature, I am raising this issue now because currently the possibility of not being able to remain with the department due to the fact there is no civilian position for a supervisor of latent prints and photography is weighing heavy on me.

([Filing No. 40-10](Filing No. 40-10)).

Having not received a response to her September 2013 email, Spreckelmeyer sent another email to Superintendent Carter on March 20, 2014, which stated,

> I very much want to continue to serve the Indiana State Police and the laboratory under your command. I have spoken to Lt. Colonel Turner on several occasions concerning my position as the fingerprint supervisor and the fact it will convert to a civilian position (E-7). I cannot seem to receive an answer as to my returning to my position in a civilian capacity and time is limited due to my drop date being July 5. I have been told there is currently no position and then I was told there was no money. There is a possibility that an E-7 position may become available as the Indianapolis Lab Manager has recently interviewed for the firearms examiner's position at the Lowell Lab. Mark Keisler was retained at the low end of the pay scale for an experienced E-7 and I have seen in the past that positions have been found and moved. The fingerprint unit's 2nd civilian fingerprint supervisor position was moved so Mark Keisler could be retained. . . . I am not complaining just stating facts. . . . I continue to be frustrated by the lack of communication and different answers I keep receiving . . . .

([Filing No. 40-11](Filing No. 40-11)).

Superintendent Carter forwarded Spreckelmeyer's March 20, 2014 email to Lieutenant Colonel Larry Turner, a member of the command staff, and asked for Turner's thoughts, noting, "I remember you said that we were waiting to see how Shannon [Spreckelmeyer] did during these last few months." *Id.*

On March 27, 2014, Superintendent Carter responded to Spreckelmeyer. He explained,

> I am very clear on what you hope to accomplish and understand some of your frustration. While answers seem to be simple, they NEVER are and I am doing the best I can in regards to our timeline. You have not gotten absolute answers from LTC Turner or Major Holland because they do not know the answer – those are the

facts. Additionally, comparing one employee issue to another, or one job to another, generally speaking is an unfair comparison.

(Filing No. 40-12).

Each of the conversations between Superintendent Carter and Spreckelmeyer involving Spreckelmeyer's impending retirement and desire to transition to a civilian position were cordial and friendly. During a conversation at the War Memorial, Superintendent Carter indicated he hoped that Spreckelmeyer would be able to come back and work for him. During her exit interview, Superintendent Carter and Spreckelmeyer discussed her desire to return to ISP, but they never discussed the possibility of a latent print position being created for her. Spreckelmeyer acknowledged that Superintendent Carter never said anything to her in their conversations that led her to believe she was being discriminated against based on her gender. (Filing No. 40-3 at 7–8.) Spreckelmeyer retired from ISP as a merit trooper on July 5, 2014, and she was not employed by ISP in a civilian position following her retirement. (Filing No. 15 at 6.)

ISP had represented to Spreckelmeyer that a civilian latent print unit supervisor position, and funding for such a position, was not available leading up to and at the time of her retirement. Pamela Douglas, ISP's human resources manager, believes that ISP tried to find funding for a civilian position before Spreckelmeyer's retirement, but the positions that had been found for funding did not add up to the funding needed for the civilian position. (Filing No. 40-5 at 10.) However, Pamela Douglas also testified that no efforts or communications to fund the position were made until after Spreckelmeyer's retirement. After Spreckelmeyer retired, her salary reverted back to ISP's regular operating account, and according to ISP's internal documents, the subsequently converted civilian latent print supervisor position was funded 96.6% with "General Funds." (Filing No. 40-5 at 10, 12; Filing No. 40-17.) Furthermore, ISP's request to reclassify a "Clerical Assistant 3" position to a civilian latent print supervisor position was not made until

5

January 27, 2015, more than six months after Spreckelmeyer's retirement and a month after she filed her charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Filing No. 40-16.)

On January 29, 2015, ISP submitted its conversion request to the strategic hiring committee to allow the latent print unit supervisor position to become a civilian position. The request noted that it had been "reviewed and approved by the Superintendent." It further noted that, "[s]everal years ago, the process was started to 'convert' former police positions to civilian positions, thereby allowing the Department to utilize the law enforcement skills of Troopers in a more efficient manner. This request follows that model." (Filing No. 40-6.) ISP also indicated that "in accordance with established strategy, the position needs to be 'civilianized.'" (Filing No. 40-17 at 1.) The conversion request was approved eighteen days later on February 16, 2015. (Filing No. 40-7.)

At the time the civilian latent print unit supervisor position became available, Spreckelmeyer was no longer an employee of ISP because of her retirement months earlier. If she wanted the civilian position, Spreckelmeyer was required to apply for the position. (Filing No. 40-5 at 14–15; Filing No. 40-2 at 17.) The job duties of the latent print unit supervisor were the same before and after the conversion from a merit position to a civilian position; thus, the civilian position was the same job that Spreckelmeyer had been performing prior to her retirement, just without the police powers. (Filing No. 40-2 at 16.)

Spreckelmeyer knew the civilian latent print unit supervisor position was open. However, she did not apply for the position because she felt she did not need to apply for it because Keisler did not have to apply for the civilian position that he was given. Before the unit supervisor position opened but after Spreckelmeyer's retirement, Spreckelmeyer applied for a lab manager position

6

with ISP but was not offered the job. (Filing No. 40-3 at 10–11.) A male internal candidate, Marcus Montooth, was given the civilian latent print unit supervisor position at ISP. (Filing No. 40-5 at 7.)

On December 12, 2014, Spreckelmeyer filed her charge of discrimination with the EEOC, asserting claims of sex discrimination and retaliation. (Filing No. 37-4.) The EEOC issued its dismissal and notice of rights to Spreckelmeyer on May 15, 2015. (Filing No. 40-1 at 2–3.) Spreckelmeyer then initiated this Title VII lawsuit on June 11, 2015, for her claims of discrimination and retaliation. (Filing No. 1.) After answering the Complaint, ISP filed its Motion for Summary Judgment on June 10, 2016.

## II.    SUMMARY JUDGMENT STANDARD

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by

specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.  DISCUSSION

ISP requests summary judgment on Spreckelmeyer's sex discrimination and retaliation claims, asserting that summary judgment is appropriate because Spreckelmeyer cannot support her claims of discrimination and retaliation and ISP had legitimate, nondiscriminatory reasons for not providing a civilian position to Spreckelmeyer following her retirement.

As an initial matter, the Court notes that Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

A. **Legal Principles Governing Employment Discrimination and Retaliation Claims**

A plaintiff may show unlawful discrimination under Title VII through a direct method or, as an alternative, indirectly through the burden-shifting mechanism established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may offer direct or circumstantial evidence to prove discrimination. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that the adverse employment action was impermissibly discriminatory. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff satisfies this burden, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to submit evidence that the employer's stated reason is pretextual. *Id.*

The plaintiff establishes a *prima facie* case of sex discrimination by presenting evidence that would allow a reasonable jury to find that: (1) she is a member of a protected class; (2) she performed satisfactorily on the job in accordance with her employer's legitimate expectations; (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Rhodes*, 359 F.3d at 504.

To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she satisfactorily met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employee who did not engage in the statutorily protected activity. *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 309 (7th Cir. 2012).

Regardless of whether a plaintiff uses the direct method, indirect method, or both methods, "the legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id*. The sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if she was a different gender or did not engage in protected activity and everything else had remained the same. *See Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994).

Describing the evidence courts consider when reviewing discrimination claims, the Seventh Circuit explained:

> Three types of circumstantial evidence of intentional discrimination can be distinguished. The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. Each type of evidence is sufficient by itself (depending of course on its strength in

relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

*Troupe*, 20 F.3d at 736 (citations omitted).

The Seventh Circuit further explained:

[I]t is not true that to get over the hurdle of summary judgment a plaintiff must produce the equivalent of an admission of guilt by the defendant. All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class.

*Id.* at 737.

### B. Spreckelmeyer's Discrimination and Retaliation Claims

It is undisputed that Spreckelmeyer is a member of a protected class and that she performed satisfactorily on the job in accordance with ISP's legitimate expectations. ISP, however, disputes the allegations that Spreckelmeyer suffered an adverse employment action, was treated less favorably than similarly situated employees, and engaged in statutorily protected activity. The Court will address the retaliation and discrimination claims in turn.

#### 1. Retaliation

Spreckelmeyer relies on her two emails sent to Superintendent Carter on September 16, 2013 and March 20, 2014, for her claim of retaliation. She asserts that the emails described or inferred sex discrimination by ISP when ISP transitioned Keisler into his civilian position. Spreckelmeyer argues that these two emails constituted statutorily protected activity, and ISP refused to provide a civilian position to her, in part, because of her emails.

ISP argues that summary judgment should be granted on the retaliation claim because Spreckelmeyer's emails did not constitute protected activity, and thus, cannot serve as the basis for a retaliation claim. ISP explains that the emails failed to point out any unlawful discrimination.

11

ISP also argues summary judgment is appropriate based on the other elements of a retaliation claim.

As noted above, to establish a retaliation claim, a plaintiff must show that she engaged in a statutorily protected activity, and she suffered an adverse employment action because of that protected activity. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). To constitute a statutorily protected activity, a complaint to an employer must indicate some connection between the alleged discrimination and a protected class. Even an official complaint filed with an employer must indicate discrimination occurred because of a protected class, such as sex, in order to constitute statutorily protected activity under Title VII. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id*. Importantly, "[a]n employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (citation omitted).

ISP argues that the two emails that serve as the sole basis for Spreckelmeyer's retaliation claim do not constitute statutorily protected activity because they made no mention of any discrimination and did not state anything regarding sex or gender. Because discrimination against a protected class is in no way discussed or inferred, ISP could not have been on notice of a discrimination complaint and could not have retaliated against such a complaint. Spreckelmeyer simply disagrees with ISP's characterization of her emails.

The Court again quotes Spreckelmeyer's emails here:

> My drop date is July 5, 2014, and it is my desire to finish my drop time as a State Trooper. . . . My current position in the laboratory is Unit Supervisor for the Latent

12

> Print and Photography Units. . . . I have been told there will no longer be two Latent Print Unit Supervisors as that position was moved to keep Mark Keisler as the civilian Firearms Supervisor, a very good move for the department. My situation and Mark's mirror each other except for the fact I am in the drop program and have a concrete end date of 7-5-14. I very much wish to return to my position in a civilian capacity. . . . I know you cannot guarantee I will be able to return as a civilian even though a latent print supervisor's position will be needed upon my retirement. If this seems premature, I am raising this issue now because currently the possibility of not being able to remain with the department due to the fact there is no civilian position for a supervisor of latent prints and photography is weighing heavy on me.

([Filing No. 40-10](#)).

> I very much want to continue to serve the Indiana State Police and the laboratory under your command. I have spoken to Lt. Colonel Turner on several occasions concerning my position as the fingerprint supervisor and the fact it will convert to a civilian position (E-7). I cannot seem to receive an answer as to my returning to my position in a civilian capacity and time is limited due to my drop date being July 5. I have been told there is currently no position and then I was told there was no money. There is a possibility that an E-7 position may become available as the Indianapolis Lab Manager has recently interviewed for the firearms examiner's position at the Lowell Lab. Mark Keisler was retained at the low end of the pay scale for an experienced E-7 and I have seen in the past that positions have been found and moved. The fingerprint unit's 2nd civilian fingerprint supervisor position was moved so Mark Keisler could be retained. . . . I am not complaining just stating facts. . . . I continue to be frustrated by the lack of communication and different answers I keep receiving . . . .

([Filing No. 40-11](#)).

Spreckelmeyer's emails convey the message that she wanted to obtain a civilian position after her retirement. They communicate the possibility that positions can be moved around so that a civilian position can be available. The emails point out that this was done for Keisler. She communicate that it was "a very good move for the department" to keep Keisler as the civilian firearms supervisor. Spreckelmeyer's emails also indicate that her situation mirrored Keisler's situation except that she was in the DROP program and had a concrete end date of July 5, 2014. She also communicate her frustration in the lack of communication and different answers she kept receiving.

13

The Court agrees with ISP that the two emails did not discuss, infer, or complain about any unlawful discrimination on the basis of any protected class. As a result, there was no statutorily protected activity in which Spreckelmeyer engaged that ISP could have retaliated against. Thus, Spreckelmeyer's Title VII retaliation claim must fail as a matter of law, and ISP is entitled to summary judgment on that claim. ISP's Motion for Summary Judgment on the retaliation claim is **granted**.

### 2. <u>Discrimination</u>

To support a claim of sex discrimination, a plaintiff must show that she is a member of a protected class, met her employer's legitimate expectations, was subjected to an adverse employment action, and similarly situated employees outside of her protected class were treated more favorably. *Rhodes*, 359 F.3d at 504. The ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

ISP acknowledges that Spreckelmeyer is a member of a protected class and that she always met ISP's legitimate expectations. However, ISP contends that Spreckelmeyer did not suffer an adverse employment action, and she was not treated less favorably than similarly situated employees because there was no similarly situated employee. ISP also asserts that it had legitimate, nondiscriminatory reasons for not providing a civilian position to Spreckelmeyer after her retirement as a merit trooper. First, there was no job position or funding available at the time when Spreckelmeyer retired. Second, Spreckelmeyer did not apply for the civilian position when it became available after her retirement. In response to ISP's Motion, Spreckelmeyer designated

evidence and advanced arguments to show that her discrimination claim should survive summary judgment and proceed to trial.

First, ISP argues that Spreckelmeyer did not suffer an adverse employment action because she was not fired or demoted and did not experience a significant change in benefits. ISP points to *Jones v. City of Springfield*, 554 F.3d 669 (7th Cir. 2009), to argue that its failure to transition Spreckelmeyer into a civilian position after her retirement as a merit trooper cannot constitute an adverse employment action. ISP frames its position by arguing that Title VII does not require an employer to create a non-existent position to avoid liability under Title VII.

In *Jones*, the Seventh Circuit affirmed the district court's decision to grant summary judgment to the employer because the plaintiff failed to present evidence showing that there was an open position into which he could have been promoted or that the employer decided not to create a position for him because of his race. The Seventh Circuit explained:

> The lack of an opening is always a legitimate reason for refusing to hire or promote. If, for example, no employee is promoted during the relevant time period, a failure-to-promote claim must fail because the claimant cannot argue that he was treated differently than anyone else. In other words, Title VII does not mandate the creation of new positions. In rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was racially motivated.

*Id.* at 673 (citations omitted). The Seventh Circuit further explained, "All Jones can prove is that the practice of early promotions exists. He has not shown, for example, that it was used only to promote black officers," and "as the district court explained, Jones has not presented evidence showing that the [later-created] vacancy was ever filled." *Id.* at 672, 673.

Spreckelmeyer responds that ISP's reliance on *Jones* is misplaced. She asserts that the facts of this case are materially different than *Jones* because ISP, unlike the employer in *Jones*, has an established policy and practice of converting merit positions to civilian positions, and this

15

process of conversion has been used for men only. The plaintiff in *Jones* could not provide any evidence of the employer's policy and practice of promoting solely African-American police officers where no vacancy existed. Spreckelmeyer, on the other hand, has designated evidence that ISP had an established process, practice, and strategy of converting former police positions to civilian positions. ISP's conversion requests submitted to its strategic hiring committee specifically note this established process and strategy. ([Filing No. 40-6](); [Filing No. 40-17 at 1]().) Spreckelmeyer also has designated evidence that the conversion process was utilized for men only and occurred approximately ten times. ([Filing No. 40-5 at 12]().)

Spreckelmeyer's designated evidence sufficiently distinguishes this case from the *Jones* case in regard to whether the plaintiff has suffered an adverse employment action. While, normally "Title VII does not mandate the creation of new positions," "[i]n rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was [impermissibly] motivated." *Jones*, 554 F.3d at 673. The decision not to convert Spreckelmeyer's supervisory position to a civilian supervisory position left Spreckelmeyer unemployed after her decades of service with ISP. The designated evidence, viewed in the light most favorable to Spreckelmeyer as the non-movant, shows a dispute of material fact regarding whether Spreckelmeyer suffered an adverse employment action, and thus, the resolution of this issue should be decided at trial, not on summary judgment.

Next, ISP argues that Spreckelmeyer was not treated less favorably than similarly situated employees because there was no similarly situated employee. The parties focus on the similarities and differences between Spreckelmeyer and Keisler.

Spreckelmeyer focuses on the similarities between herself and Keisler. In the spring of 2013, they were the only two remaining non-civilian analytical supervisors in the Laboratory

Division. They were subject to the same rules, policies, and procedures. They were subject to the same chain of command and shared the same supervisor. They were both First Sergeants in April 2013. Both individuals required Superintendent Carter's approval to have their positions converted to civilian positions after their retirement.

ISP focuses on the differences between Spreckelmeyer and Keisler. They worked in different units within the Laboratory Division. Keisler was a nationally recognized expert in the field of firearms, whereas Spreckelmeyer was not considered a nationally recognized expert in her field. Additionally, there was a civilian supervisor position available when Keisler retired, but no position was available when Spreckelmeyer retired.

When considering similarly situated employees, the Seventh Circuit has explained that the "plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). However, a similarly situated employee "need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846. The analysis calls for a "flexible, common-sense" approach. *Id*. The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). The decision of whether employees are similarly situated is usually a factual question left for the jury to decide. *Coleman*, 667 F.3d at 846–47.

While Spreckelmeyer was not nationally recognized as an expert in her field and Keisler was a recognized expert in his field, Spreckelmeyer always met the legitimate expectations associated with her positions. ISP consistently provided positive performance evaluations of Spreckelmeyer, and ISP never formally disciplined her. While there was a civilian supervisor position available when Keisler retired but not when Spreckelmeyer retired, Spreckelmeyer

17

designated evidence indicating that in order to fund Keisler's civilian position, ISP moved a vacant supervisory position from the latent print unit, Spreckelmeyer's unit, into the firearms unit. (Filing No. 40-4 at 6–8.) Thus, there is evidence suggesting that this difference between Spreckelmeyer and Keisler actually was created by ISP and supports Spreckelmeyer's claim of discrimination. Spreckelmeyer and Keisler were the only two remaining non-civilian analytical supervisors in the Laboratory Division in early 2013. They were subject to the same rules, policies, procedures, chain of command, and supervisor. They were both First Sergeants at the time of their retirements, and both individuals required Superintendent Carter's approval to have their positions converted to civilian positions after their retirement. The Court determines that there are sufficient material similarities between Spreckelmeyer and Keisler that the question should be given to the trier of fact to decide whether Spreckelmeyer was treated less favorably than similarly situated employees outside of her protected class.

Finally, ISP argues that it had legitimate, nondiscriminatory reasons for not providing a civilian position to Spreckelmeyer after her retirement as a merit trooper. ISP asserts there was no job position or funding available at the time Spreckelmeyer retired, and Spreckelmeyer did not apply for the civilian position when it became available after her retirement.

As noted above, Spreckelmeyer designated evidence indicating that in order to fund Keisler's civilian position, ISP moved a vacant supervisory position from the latent print unit, Spreckelmeyer's unit, into the firearms unit. (Filing No. 40-4 at 6–8.) Thus, there was a position available in Spreckelmeyer's unit before ISP decided to move it to Keisler's unit. ISP also knew three years before Spreckelmeyer's retirement that her retirement would be on a set date because of her participation in the DROP program. Pamela Douglas, ISP's human resources manager, provided conflicting testimony but part of her testimony was that no efforts or communications to

18

fund a civilian position were made until after Spreckelmeyer's retirement.  Superintendent Carter was asked about the timing of converting Spreckelmeyer's position to a civilian position:

> Q  Why?  Why was she not transitioned to a civilian position?
> A  The process by which that job opened did not occur by the time she left, so the position opened after she left, from merit to civilian.
> Q  And that process did not occur because you did not start it until after she left; isn't that correct?
> A  That would be accurate.

([Filing No. 40-2 at 14](#)).

This designated evidence could permit a reasonable factfinder to conclude that ISP's stated reason for not transitioning Spreckelmeyer into a civilian position—there was no job position or funding available at the time Spreckelmeyer retired—was a pretext for discrimination.

Regarding the fact that Spreckelmeyer did not apply for the civilian position when it became available after her retirement, Spreckelmeyer explains that she did not apply because she should not have been required to apply for it because ISP had automatically transitioned Keisler into his position without applying for it, giving a male preferential treatment while discriminating against a similarly situated female.  This is the central issue of this case, a question that is properly resolved at trial.  Additionally, Spreckelmeyer's failure to apply for the open position occurred months after ISP did not convert her position to a civilian position.  Therefore, Spreckelmeyer's failure to apply in February 2015 could not serve as the basis for ISP's failure to convert her position to a civilian position in July 2014.

The designated evidence establishes that there are questions of material fact regarding Spreckelmeyer's sex discrimination claim that must be resolved at trial, and thus, summary judgment is not appropriate on the discrimination claim.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Indiana State Police Department's Motion for Summary Judgment (Filing No. 37). Summary judgment is granted with respect to the retaliation claim, and Plaintiff Shannon Spreckelmeyer's claim for sex discrimination remains pending for trial in this litigation.

**SO ORDERED.**

Date: 11/23/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Craig M. Williams
FOX WILLIAMS & SINK LLC
cwilliams@fwslegal.com

Ryan Patrick Sink
FOX WILLIAMS & SINK LLC
rsink@fwslegal.com

Nikki G. Ashmore
INDIANA ATTORNEY GENERAL'S OFFICE
Nikki.Ashmore@atg.in.gov

Betsy M. Isenberg
INDIANA ATTORNEY GENERAL'S OFFICE
Betsy.Isenberg@atg.in.gov

Caryn Nieman Szyper
INDIANA ATTORNEY GENERAL'S OFFICE
caryn.szyper@atg.in.gov